UN Sealed 2/26/10 per DK #252
Public and unofficial staff access to this instrument are prohibited by court order.

**PLEA PACKET MEMO**

United States District Court
Southern District of Texas
FILED
JUL 3 0 2009
Clerk of Court

DEFENDANT: **OSIEL CARDENAS-GUILLEN**

CASE# B-00-118-S1

PENALTY RANGE: <u>Count One</u> - Minimum 10 yrs and a maximum of life imprisonment, $4,000,000.00 fine, plus 5 yr SRT
<u>Counts Fourteen, Fifteen, and Sixteen</u> - Up to 5 yrs imprisonment, $250,000.00 fine, plus 3 yr SRT
<u>Count Seventeen</u> - Not more than 20 yrs imprisonment, $500,000 fine or not more than twice the value of the funds laundered, whichever is greater, plus 3 yrs SRT

RECOMMENDATION: **Rule 11(c)(1)(C) PLEA to Counts One, Fourteen, Fifteen, Sixteen, and Seventeen; forfeiture of fifty million dollars; AND WAIVER OF APPEAL RIGHTS AS OUTLINED IN THE PLEA AGREEMENT: Defendant and the United States agree that the appropriate disposition of the case is a sentence of twenty-five years as to Count One, five years as to Counts Fourteen, Fifteen, and Sixteen, and twenty years as to Count Seventeen, to run concurrently. Defendant and the United States further agree that Defendant will forfeit to the United States fifty (50) million dollars. The United States agrees that no further federal charges will be brought in the Southern District of Texas for acts committed prior to Defendant's extradition and will further move, after sentencing, to dismiss the remaining counts of the indictment and the original indictment at the time of sentencing.**

## FACT SUMMARY SHEET

### I. Drug Trafficking Conspiracy

From at least in or about November 1998 to on or about the date of the indictment, April 9, 2002, Defendant **OSIEL CARDENAS-GUILLEN, AKA INGENIERO, AKA EL SEÑOR, AKA NOVENTA Y UNO, AKA FANTASMA**, was the leader of a drug trafficking organization, hereinafter referred to as the CARDENAS-GUILLEN DTO, which imported hundreds of kilograms of cocaine and thousands of pounds of marijuana into the United States from the United Mexican States. Once imported, the cocaine and marijuana would be distributed to others for further distribution. Over the years, **CARDENAS-GUILLEN** utilized numerous persons to assist him in distributing the controlled substances smuggled into the United States. In particular, during 2000, one of the DTO's transportation cell managers was RAFAEL BETANCOURT-VELEZ. In turn, BETANCOURT-VELEZ utilized other individuals including ERIK ESCALANTE and JULIO MEZA to actually find transportation for the controlled substances. On or about August 25, 2000, approximately 271 kilograms gross weight of cocaine was found concealed within a pallet of jalapeño peppers in a tractor trailer at the Border Patrol Checkpoint near Falfurrias, Texas. ESCALANTE had hired the driver of the load to

transport it to its destination near Atlanta. After the seizure, ESCALANTE had to meet with **CARDENAS-GUILLEN** in Mexico to explain that the cocaine was seized and provide proof that he did not steal the cocaine. Later, on or about October 17, 2000, one of MEZA's workers was stopped after he left a stash location in Brownsville, Texas operated by MEZA. A search of the van he was driving resulted in the seizure of approximately 200 kilograms of cocaine which was being transported to the person who was arranging for the further distribution of the cocaine. That same day, a search of the stash location in Brownsville resulted in the seizure of an additional approximately 120 kilograms of cocaine. Later, MEZA attended a meeting in Mexico during which BETANCOURT-VELEZ explained to **CARDENAS-GUILLEN** that the cocaine was seized by law enforcement and provided proof that MEZA did not steal it. Although not detailed herein, evidence in the possession of the United States indicates that in addition to the controlled substances discussed herein, **CARDENAS-GUILLEN**, through his DTO, was involved with numerous other shipments of controlled substances to various locations in the United States including, but not limited to 63 kilograms of cocaine seized on or about July 1, 2000 near Harlingen, Texas, 10 kilograms of cocaine seized in Houston, Texas on or about December 12, 2000, 250 kilograms of cocaine seized on or about April 18, 2001 near Houston, Texas, 246 kilograms of cocaine seized on or about April 27, 2001 in Brownsville, Texas, 198 kilograms of cocaine seized on or about April 30, 2001 in Brownsville, Texas, 290 kilograms of cocaine seized on or about August 24, 2001 near McAllen, Texas, and 226 kilograms of cocaine seized on or about September 18, 2001 near Atlanta, Georgia.

## II. Money Laundering Conspiracy

**CARDENAS-GUILLEN** had many people who assisted him, some of whom directed others, to collect, transport, and account for the millions of dollars in drug proceeds which were generated by the DTO. One of the persons who worked at the direction of **CARDENAS-GUILLEN** accounting for the expenses of the DTO and the proceeds generated by the DTO was an individual known as Noventa. For a period of time in 2000 and 2001, Noventa was the primary bookkeeper for the DTO. Noventa was responsible for the collection and accounting of millions of dollars in drug proceeds in the form of United States currency. At times, the DTO had individuals who worked in various cities in the United States, such as Houston, Texas and Atlanta, Georgia, who were responsible for gathering the proceeds and delivering them to others who were responsible for transporting the proceeds from the various locations in the United States to the Rio Grande Valley of South Texas and ultimately into the United Mexican States. On June 1, 2001, pursuant to a court authorized wire interception, agents with the DEA in Atlanta, Georgia intercepted a conversation between ARISTEO ZUVIRI, who was responsible for the books in the Atlanta area, and Noventa. During that conversation, which lasted over thirty (30) minutes, ZUVIRI and Noventa discussed, among other things, the accounting of over a million dollars in drug proceeds which was transported from Atlanta to the Rio Grande Valley in television sets and which was ultimately transported into and received in Mexico. As a result of this interception and others, DEA agents established surveillance on members of the DTO in the Atlanta

area and on June 7, 2001, agents seized approximately 250 kilograms of cocaine shortly after it was offloaded from a tractor trailer to a van driven by a member of the DTO. Shortly after the seizure of cocaine, agents seized drug proceeds in the amount of approximately $3,107,686 in United States currency at a residence in Atlanta, Georgia utilized by ZUVIRI and other members of the CARDENAS-GUILLEN DTO to collect and account for proceeds of drug trafficking activities in the area. Along with the currency, agents seized fourteen spiral notebooks and loose papers which were sent to the Racketeering Records Analysis Unit of the Federal Bureau of Investigation Laboratory. An analysis of the records revealed that between February 18, 2001 and May 23, 2001, the CARDENAS-GUILLEN DTO distributed a minimum of 2,827 kilograms of cocaine for a minimum total sale price of $41,059,000. Later, on or about August 10, 2001, near Baton Rouge, Louisiana, drug proceeds in the amount of approximately $949,000 in United States currency were seized as it was being transported by co-conspirators from the Atlanta, Georgia area to Brownsville, Texas for delivery to another co-conspirator and ultimate delivery into the United Mexican States. During the time span of the conspiracy, at least $300,000,000 of drug proceeds in the form of U.S. currency were generated through the distribution of controlled substances within the United States by the various members of the CARDENAS-GUILLEN DTO. **CARDENAS-GUILLEN** knew that the currency involved was proceeds from the distribution of controlled substances and that the actions of others, taken on his behalf and on behalf of the CARDENAS-GUILLEN DTO as a whole, in collecting, transporting, and accounting for the proceeds promoted the ability of the CARDENAS-GUILLEN DTO to continue to traffic in illegal controlled substances.

### III. Drug Conspiracy and Assault on Sheriff's Deputy

In May of 1999, Abraham Rodriguez, who was at that time employed as a Cameron County Sheriff's Deputy working in cooperation with and under the control of federal officers of the United States Customs Service, began negotiations, in his undercover capacity, with RICARDO ELOY GARCIA, to transport a load of marijuana to Houston, Texas. On May 25, 1999, Rodriguez received approximately 988 kilograms of marijuana from GARCIA's co-conspirators in Brownsville, Texas. GARCIA promised to pay a total of $100,000 for the transportation of the marijuana and told Rodriguez that the marijuana belonged to **CARDENAS-GUILLEN**. Rodriguez wanted to collect his pay prior to the controlled delivery of the marijuana in Houston, so Rodriguez refused to deliver the marijuana until his was paid. On June 9, 1999, Rodriguez received a telephone call from **CARDENAS-GUILLEN** who identified himself as the owner of the marijuana. **CARDENAS-GUILLEN** threatened to kill Rodriguez and his family if the marijuana was not released to his people in Houston. **CARDENAS-GUILLEN** told Rodriguez that it might take him a day, a week, or a year, but he would find him and his family and kill them. **CARDENAS-GUILLEN** further told Rodriguez that he did not care if he was a police officer, an informant, or a DEA agent, he would find him and kill him. The following day, **CARDENAS-GUILLEN** called Rodriguez again and Rodriguez agreed to release the marijuana. **CARDENAS-GUILLEN** provided Rodriguez with a telephone number of ADAN MEDRANO, one of his associates. Rodriguez made

arrangements with MEDRANO to have the marijuana delivered and on June 11, 1999, law enforcement had a van containing the marijuana delivered to a store parking lot in Houston, Texas. An individual was observed entering the van and driving away. He was stopped approximately 1 mile from the store. Although this particular incident involved slightly less than 1,000 kilograms of marijuana, **CARDENAS-GUILLEN** does not dispute that the overall conspiracy involved more than 1,000 kilograms of marijuana. There is no evidence to indicate that **CARDENAS-GUILLEN** knew that Rodriguez was a law enforcement officer at the time when the threats were made to Rodriguez.

### IV. Assault on DEA and FBI Agents in Matamoros

On November 9, 1999, DEA Special Agent Joe Dubois and FBI Special Agent Daniel Fuentes were assigned to the United States Consulate in Monterrey, Nuevo Leon, Mexico. On that date, in performance of their official duties, they traveled to Matamoros, Tamaulipas, Mexico in their official vehicle with diplomatic plates to meet with a person who was to provide them with information regarding locations believed to be utilized by the Gulf Cartel which was at that time headed by **OSIEL CARDENAS-GUILLEN**. While traveling through Matamoros in their vehicle with their passenger, Agents Dubois and Fuentes were surrounded by vehicles which boxed them in and prevented them from leaving. Although they were surrounded by many armed men, the first person at the door of Agent Dubois was JUAN CARLOS DE LA CRUZ REYNA. DE LA CRUZ REYNA was armed with an assault rifle which he pointed at Agent Dubois. **CARDENAS-GUILLEN**, also armed, approached the window of Agent Fuentes. **CARDENAS-GUILLEN** and others threatened to kill Agents Dubois and Fuentes if they did not exit the vehicle. Even after Agent Fuentes identified himself as an FBI agent, **CARDENAS-GUILLEN** continued to threaten to kill them. At one point during the assault, DE LA CRUZ REYNA reached in through the open window and tried to open the door of Agent Dubois. Agent Dubois struggled with DE LA CRUZ REYNA to prevent him from opening the door. Members of the group were finally able to open the door, but Agent Dubois managed to pull it closed again. Eventually, **CARDENAS-GUILLEN** allowed the agents and their passenger to leave after warning them not to return to Matamoros.

**I have read and understand the factual summary and recommendation being made to the court.**

_____   JULIO/30/2009
Defendant                Date

_____   7-30-09
Attorney for Defendant    Date
C. J. QUINTANILLA

_____
Attorney for Defendant    Date

_____   7-30-09
Attorney for Defendant    Date

_____   7-30-09
Attorney for Defendant    Date

5