**REVISED MAY 18, 2011**


United States District Court
Southern District of Texas
FILED

JUN 2 0 2011

David J. Bradley, Clerk of Court

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 17, 2011

Lyle W. Cayce
Clerk

No. 10-40221

1:10-MC-2

HEARST NEWSPAPERS, L.L.C., doing business as
Houston Chronicle,

       Intervenor Plaintiff - Appellant

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee

v.

OZIEL CARDENAS-GUILLEN,

       Defendant - Appellee

v.

HEARST NEWSPAPERS, L.L.C., doing business as Houston Chronicle,

       Intervenor - Appellant

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before BARKSDALE, DENNIS, and HAYNES, Circuit Judges.

DENNIS, Circuit Judge:

This case involves a district court's order to close the sentencing proceeding of a drug cartel leader without first giving the press and public notice and an opportunity to be heard regarding the decision to close the hearing. We conclude that the press and public have a First Amendment right of access to sentencing hearings, and that the district court should have given the press and public notice and an opportunity to be heard before closing the sentencing proceeding in this case.

## BACKGROUND

Oziel Cardenas-Guillen, the former leader of the Gulf Cartel, a notorious Mexican drug cartel, was arrested in Mexico in 2003. At the time, according to the government, Cardenas-Guillen was considered "one of the most wanted, feared, and violent drug traffickers in the world," and was "widely believed to be partly responsible for the ongoing drug trafficking wars and 'bloodbaths' along the Mexican border, resulting in the deaths of approximately 2000 persons." Even while incarcerated in Mexico, he "reportedly continued to coordinate the activities of his organization from jail."

In 2007, the United States took custody of Cardenas-Guillen. He was charged, inter alia, with involvement in conspiracies to distribute large quantities of marijuana and cocaine, violating the continuing-criminal-enterprise statute, 21 U.S.C. § 848 (also known as the "drug kingpin statute"), and threatening federal officers. The case was assigned to a district court in the Brownsville Division of the Southern District of Texas.

The government moved to transfer the venue for the criminal trial from Brownsville, Texas, to another location. Among other reasons, the government cited concerns about being able to ensure the security of personnel and civilians, due to the proximity of Brownsville to the Mexican border. The government enclosed a letter from the United States Marshals

Service explaining that Houston would be the best venue for holding the trial. Cardenas-Guillen did not oppose the motion, and the district court granted the transfer motion, directing that the case be transferred to Houston. The case proceeded slowly, with almost all of the filings being made under seal. Hearst Newspapers, L.L.C., doing business as the Houston Chronicle (hereinafter "the Chronicle"), alleges that many of the filings were sealed without following proper procedures.

On October 30, 2009, the Chronicle sent a letter to the district court, making several requests. With regard to any future proceedings, the Chronicle requested that the district court give notice and an opportunity to be heard before closing such proceedings, and, if the court decided to close a proceeding, to narrowly tailor such a closure and support its decision with on-the-record findings. The Chronicle also requested that the court unseal any sealed documents or make on-the-record findings regarding why those documents remained under seal, and narrowly tailor any sealing. In response, the district court ordered the parties to explain why previously sealed documents should remain under seal. The parties conceded that some documents did not need to remain sealed, but argued that others should remain under seal until the conclusion of the case.

On February 9, 2010, the Chronicle moved to intervene and requested that any uncontested documents be unsealed immediately, that the docket be updated to provide some indication of documents that had been sealed, that the government's sealed memoranda be unsealed at least in redacted form so that the Chronicle could respond, and that the court narrowly tailor any sealing through redaction and enter specific findings as to documents that remained under seal. The Chronicle attached to the motion its letter of October 30, 2009. At some point, Cardenas-Guillen agreed to plead guilty to the charges against him, but this fact was not made public. On February 18,

3

2010, the government moved to close his sentencing hearing for reasons of public safety, and also moved to deprive the public of notice that the hearing was taking place. The government attached to the motion the supporting affidavit of George Hephner, the Supervisory Deputy United States Marshal for the Houston Division Operations Section. The next day, without additional proceedings, the district court granted the motion in a sealed order. The order expressly stated that it would not be unsealed until after the sentencing hearing took place. The district court also sealed the government's motion.

The court scheduled the sentencing for February 25, 2010. A local television station received word that the trial of Cardenas-Guillen would occur on that date and inquired of the court as to whether that information was correct. After consulting with the United States Marshals Service, the district court covertly rescheduled the sentencing hearing for February 24, 2010.

During the sentencing hearing on that day, a Chronicle reporter discovered a closed courtroom where the proceeding was being held and attempted to gain access. An attorney for the Chronicle joined the reporter and filed a handwritten motion requesting the district court to open the sentencing hearing and to give the Chronicle an opportunity to be heard before the closed hearing was completed. The district court was aware of the Chronicle's efforts to access the proceedings and stated during the hearing that "in spite of all the efforts to ensure that this hearing not be noticed by the media, I am told that there is a reporter from the Houston Chronicle who is, as I speak, drafting a motion regarding his request to be heard — or to be present during the — the hearing." The district court declined to decide the motion at that time, and instead continued with the closed sentencing proceeding. Although the proceeding was sealed, the primary case agents

and victims, as well as Cardenas-Guillen's wife and daughter, were permitted to be present. Later that same day, after the sentencing proceeding had been completed, the district court denied the Chronicle's motion as moot.

At the sentencing, the district court accepted Cardenas-Guillen's guilty pleas and the plea agreement between him and the government. The court then sentenced Cardenas-Guillen, in accord with the plea agreement, to (1) 25 years on one count of conspiracy to possess with intent to distribute both cocaine and marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); (2) 5 years each on three counts of threatening to assault and murder federal agents, in violation of 18 U.S.C. §§ 115 and 2; and (3) 20 years on a fifth count for conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(A)(i),(a)(2)(A), and (h). The district court ordered that all the sentences would run concurrently. The district court also ordered that Cardenas-Guillen serve supervised release terms of 5 years on the count of conspiracy to possess with intent to distribute both cocaine and marijuana, and 3 years as to each of the other four counts, all to run concurrently. Finally, the district court ordered Cardenas-Guillen to pay a fine of $100,000 and special assessments totaling $500, and entered a preliminary order of forfeiture of $50 million. The district court also indicated that it would docket the record of the hearing, which would make public the fact that a sentencing hearing had occurred, once it was advised by the United States Marshals Service that doing so would be safe.

The government explains in its brief, and the district court docket confirms, that "[w]ithin hours of the sentencing hearing, the hearing was docketed." Gov. Br. 11. In addition, "the recording of the hearing and the transcript of the hearing were [made] available to the public . . . ." *Id.* The docket also shows that the Chronicle ordered a copy of the transcript, which was completed on February 25, 2010, the day after the sentencing proceeding.

On February 26, 2010, two days after the sentencing hearing, the Chronicle filed a second motion to intervene. On that same date, the district court, inter alia, granted the motion to intervene and denied the Chronicle's request for public notice of all future hearings and for an opportunity to be heard if closure were contemplated.

On March 2, 2010, the district court issued an order amending its February 24, 2010 order, to further explain the reasoning of its February 24, 2010 order. It also added that in denying the Chronicle's motion to open the sentencing proceeding and to be heard before the closure of the sentencing proceeding, it had considered the filings submitted by the government, as well as the Chronicle's February 9, 2010 motion to intervene.

The Chronicle timely appealed. On appeal, the Chronicle challenges (1) the district court's order of February 24, 2010 (as amended by the March 2, 2010 order), denying as moot the Chronicle's request to open the sentencing proceeding; (2) the district court's order of February 24, 2010 (as amended by the March 2, 2010 order), denying as moot the Chronicle's request for an opportunity to be heard prior to closure; and (3) the district court's order of February 26, 2010, denying the Chronicle's request for public notice of all future hearings and an opportunity to be heard if the court intended to close any future proceedings. The district court designated all three orders as final and immediately appealable.

We have appellate jurisdiction over the orders under the collateral order doctrine, which "establishe[s] that certain decisions of the district court are final in effect although they do not dispose of the litigation." *Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 925 (5th Cir. 1996); *see also* 28 U.S.C. § 1291 (establishing the jurisdiction of the courts of appeal over final decisions of district courts). "Appealable collateral orders include 'those district court decisions that are conclusive, that resolve important questions

completely separate from the merits, and that would render such important questions effectively unreviewable on appeal from final judgment in the underlying action.'" *Davis*, 78 F.3d at 925 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994)). The orders in this case certainly meet those criteria. *See id.* at 926 ("We have previously held on several occasions that members of the news media, although not parties to litigation, can appeal court closure orders or confidentiality orders under the collateral order doctrine.").

## STANDARD OF REVIEW

On appeal, we are asked to determine whether the press and public have a First Amendment right of access to sentencing proceedings, and, if so, whether they are also entitled to receive notice and an opportunity to be heard prior to closure of sentencing proceedings. "Because this case involves constitutional and other legal questions, we review the district court's orders de novo." *United States v. Brown (In re Times Picayune Publ'g. Corp.)*, 250 F.3d 907, 913 (5th Cir. 2001). "Specific factual findings of the district court on the issue are, of course, entitled to review under the clearly erroneous standard." *Id.*

## DISCUSSION

As an initial matter, we conclude that this court has jurisdiction over the case, because it falls within the exception to mootness for questions that are capable of repetition, yet evading review. We also conclude that the press and public, including the Chronicle, have a First Amendment right of access to sentencing proceedings. Finally, we conclude that the district court deprived the Chronicle of its First Amendment right of access, without due process, in refusing to give the press and public notice and an opportunity to be heard before sealing the sentencing proceeding.

7

## A.    Mootness

Despite the fact that Cardenas-Guillen's sentencing proceeding has already occurred, it is undisputed that this appeal is not moot.  The issues in this case are not moot because they are "capable of repetition, yet evading review." *Press-Enterprise Co. v. Super. Ct. (Press-Enterprise II)*, 478 U.S. 1, 6 (1986); *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 600 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 (1980); *United States v. Edwards*, 823 F.2d 111, 114 (5th Cir. 1987).  The issues that arise in this case are capable of repetition because the Chronicle is a prominent newspaper that seeks to cover major cases, and it is reasonable to expect that district courts will close other criminal proceedings to the Chronicle in future cases. *See United States v. Criden*, 675 F.2d 550, 554 (3d Cir. 1982) ("[I]t is reasonable to expect that [Philadelphia Newspapers, Inc.], a major newspaper publisher in the Philadelphia area, will be subjected to similar closure orders entered by the district courts in this circuit.").  At the same time, these issues often evade review due to the "short duration" of criminal trials. *Richmond Newspapers, Inc.*, 448 U.S. at 563.

## B.    The Chronicle's First Amendment right of access to the sentencing proceeding

The first question in this case is whether the press and public, including the Chronicle, have a First Amendment right of access to a sentencing proceeding.  We conclude that they do.  The Supreme Court has developed a two-part test for determining whether there is a First Amendment right of access to a particular criminal proceeding: (1) whether the proceeding has historically been open to the public and press; and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8-9; *see also Press-Enterprise Co. v. Super. Ct. (Press-Enterprise I)*, 464 U.S. 501, 505-

09 (1984). This test has been referred to as the "experience" and "logic" test. *See Globe Newspaper Co.*, 457 U.S. at 606 (explaining that "the institutional value of the open criminal trial is recognized in both logic and experience"); *see also Press-Enterprise II*, 478 U.S. at 9 (summarizing the test as "considerations of experience and logic").

In applying this test, the Supreme Court has recognized a First Amendment right of access to various aspects of a criminal prosecution. *See Press-Enterprise II*, 478 U.S. at 10 (preliminary hearings as conducted in California); *Press-Enterprise I*, 464 U.S. at 505 (jury voir dire); *Globe Newspaper Co.*, 457 U.S. at 604 (trial); *Richmond Newspapers, Inc.*, 448 U.S. at 576-77 (trial). The courts of appeals have also recognized a First Amendment right of access to various proceedings within a criminal prosecution. *See, e.g., United States v. Danovaro*, 877 F.2d 583, 589 (7th Cir. 1989) (proceeding at which guilty plea was taken); *United States v. Haller*, 837 F.2d 84, 86-87 (2d Cir. 1988) (plea hearings); *In re Knight Publ'g Co.*, 743 F.2d 231, 233 (4th Cir. 1984) (trials); *United States v. Klepfer (In re Herald Co.)*, 734 F.2d 93, 99 (2d Cir. 1984) (pretrial hearing on motion to suppress); *United States v. Chagra*, 701 F.2d 354, 363-64 (5th Cir. 1983) (pretrial bond reduction hearing); *United States v. Brooklier*, 685 F.2d 1162, 1167-71 (9th Cir. 1982) (jury voir dire, pretrial hearing on motion to suppress, and hearing conducted during trial on motion to suppress); *Criden*, 675 F.2d at 557 (pretrial suppression, due process, and entrapment hearings). *But see Edwards*, 823 F.2d at 116-17 (First Amendment right of access does not attach to mid-trial questioning of jurors about potential misconduct).[1]

---

[1] A sentencing hearing is distinguishable from mid-trial questioning of jurors regarding potential juror misconduct, which was the proceeding at issue in *Edwards*. The *Edwards* court noted that such proceedings were not traditionally open to the public, and were within the trial court's discretion to make private because of the possibility of alienating jurors from counsel and dividing jurors against each other. 823 F.2d at 116-17. In contrast, as we explain

Although neither the Supreme Court nor this court has specifically considered whether the First Amendment applies to a sentencing hearing, the Second, Fourth, Seventh, and Ninth Circuits have done so, and each has concluded that it does. *United States v. Alcantara*, 396 F.3d 189, 196-99 (2d Cir. 2005); *United States v. Eppinger*, 49 F.3d 1244, 1252-53 (7th Cir. 1995); *United States v. Soussoudis* (*In re Washington Post Co.*), 807 F.2d 383, 389 (4th Cir. 1986) (plea hearings and sentencing proceedings); *CBS, Inc. v. U.S. Dist. Ct.*, 765 F.2d 823, 825 (9th Cir. 1985) ("The primary justifications for access to criminal proceedings . . . apply with as much force to post-conviction proceedings as to the trial itself.").[2] Relatedly, courts of appeals have also recognized a First Amendment right of access to documents filed for use in sentencing proceedings. *Washington Post v. Robinson* (*Robinson*), 935 F.2d 282, 288 (D.C. Cir. 1991) (plea agreements); *Oregonian Publ'g Co. v. U.S. Dist. Ct.*, 920 F.2d 1462, 1466 (9th Cir. 1990) (plea agreements and related documents); *Haller*, 837 F.2d at 86 (plea agreements); *CBS, Inc.*, 765 F.2d at 824-25 (defendant's motion to reduce sentence under Federal Rule of Criminal Procedure 35 and government's response); *United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir. 1984) ("[T]he public has a First Amendment right to see and hear that which is admitted in evidence in a public sentencing hearing.").

We conclude, as have the other courts that have considered this question, that the public and press have a First Amendment right of access

---

below, sentencing hearings have been historically open to the press and public. Moreover, the functional concerns raised in *Edwards* are inapplicable in a sentencing hearing, especially because there is no jury.

[2] *See also United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir. 1984) (explaining that if an ambiguous district court order were "construed as being tantamount to closing the sentencing hearing," the order "could well run counter to the constitutional rule of open judicial proceedings," but declining to construe the order in that manner).

to sentencing proceedings. Indeed, we agree with the Second and Fourth Circuits that the Supreme Court's holdings in *Globe Newspaper Co.* and *Richmond Newspapers, Inc.* that there is a First Amendment right of access to a trial should, logically, already encompass sentencing hearings:

> Sentencing may . . . be viewed as within the scope of the criminal trial itself. Sentencing can occur before the termination of the trial proceeding, and, even if it occurs in a separate hearing, it clearly amounts to the culmination of the trial. Moreover, even if . . . sentencing hearings are not considered a part of the trial itself, they are surely as much an integral part of a criminal prosecution as are preliminary probable-cause hearings, suppression hearings, or bail hearings, all of which have been held to be subject to the public's First Amendment right of access.

*Alcantara*, 396 F.3d at 196-97 (quoting *In re Washington Post Co.*, 807 F.2d at 389) (quotation marks omitted)). The First Amendment right of access to a sentencing proceeding is especially salient in this case, where, as in the vast majority of criminal cases, there was no trial, but only a guilty plea. *Id.* at 199 ("It makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding, something that occurs in only a small fraction of criminal cases." (quoting *In re Herald Co.*, 734 F.2d at 98 (quotation marks omitted)).).

Moreover, applying the experience and logic test set out by the Supreme Court confirms that the public and press have a First Amendment right of access to sentencing proceedings. First, sentencing proceedings have historically been open to the press and public. *Alcantara*, 396 F.3d at 197 n.7 (listing numerous cases from the nineteenth century "describ[ing] sentencing proceedings held in open court" and citing secondary sources to explain that "[h]istorically, [s]entences were often imposed immediately after the jury returned a guilty verdict in open court"); *In re Washington Post Co.*, 807 F.2d at 389 ("Sentencings have historically been open to the public

. . . ."). As the Chronicle points out, "the United States has a rich and proud tradition of conducting public criminal trials and sentencing proceedings." These include numerous high profile cases of defendants who were considered dangerous[3]: the open trial and sentencing proceeding held in the Southern District of Texas (Houston) for Juan Garcia Abrego, who was a predecessor of Cardenas-Guillen[4] as the leader of the Gulf Cartel;[5] the open sentencing held in the Southern District of New York for Jorge Mario Paredes-Cordova,[6] who was "designated by the United States Department of Justice as one of the world's most significant drug kingpins";[7] the open sentencing proceeding held in the Eastern District of Virginia for Zacarias

---

[3] We take judicial notice of these examples pursuant to Federal Rule of Evidence 201(b), as these are facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

[4] *Narcotics Rewards Program: Antonio Ezequiel Cardenas-Guillen,* Bureau of Int'l Narcotics & Law Enforcement Affairs, U.S. Dep't of State, http://www.state.gov/p/inl/narc/rewards/123682.htm (last visited April 27, 2011) ("Following [Garcia Abrego's] 1996 arrest by Mexican authorities and subsequent deportation to the United States, Oscar Malherbe-De Leon took control of the cartel until his arrest a short time later. He was replaced by Osiel Cardenas-Guillen, who was arrested in 2003, and extradited to the United States in 2007.").

[5] *U.S. Jury Convicts Mexican on Drug Charges,* N.Y. Times, Oct. 17, 1996, *available at* 1996 WLNR 4331922 ("As the verdict was read, Mr. Garcia Abrego, 52, sat impassively, as he had throughout the four-week trial."); L.A. Times, *Texas-born Drug Lord Gets 11 Life Terms for Smuggling; Criminal also Must Pay $128 Million in Fines,* Baltimore Sun, Feb. 1, 1997, *available at* 1997 WLNR 1084726 ("U.S. District Judge Ewing Werlein sentenced Garcia Abrego, who stood with hands clasped, wearing interpreter's headphones . . . .").

[6] Bruce Golding, *Guatemalan Drug Kingpin Cries after Getting 31 Years in the Slammer,* N.Y. Post, Apr. 16, 2010, *available at* http://www.nypost.com/p/news/local/manhat tan/guatemalan/drug_kingpin_cries_after_Mb7qndOT8kdColDpvObzHI ("Jorge 'Gordo' Paredes-Cordova — whose nickname means "Fatso' in English — shuddered, shook his head and grabbed a tissue to wipe tears from his eyes after hearing the hefty sentence imposed.").

[7] Press Release, U.S. Attorney's Office, Manhattan Federal Jury Finds Cocaine Kingpin Guilty on Narcotics Importation and Distribution Charges (Nov. 6, 2009) *available at* http://www.justice.gov/usao/nys/pressreleases/November09/paredescordovajorgemarioverdi ctpr.pdf.

Moussaoui, for his participation in the attacks of September 11, 2001;[8] the open sentencing proceeding held in the Southern District of New York for Mohamed al-'Owhali, Khalfan Khamis Mohamed, Mohamed Odeh and Wadih el-Hage, for their roles in the 1998 bomb attacks on American embassies in Kenya and Tanzania;[9] the open trial and sentencing proceeding held in the Southern District of New York for Ramzi Yousef, for his role in the 1993 bombing of the World Trade Center;[10] the open trial held in the Northern District of Illinois for Al Capone;[11] the open sentencing proceeding

---

[8] *First U.S. Trial of 9/11 Case Was Full of Surprises*, Associated Press, *available at* http://www.msnbc.msn.com/id/34001021/ns/us_news-security/ (last visited Feb. 28, 2011) (describing six-week sentencing trial, including Moussaoui's demeanor and occasional outbursts, and quoting the lead prosecutor: "A valuable part of the Moussaoui trial was that we got an unvarnished, public view of this guy . . . of what we're up against." (alterations in original)); Neil A. Lewis, *One Last Appearance, and Outburst, From Moussaoui*, N.Y. Times, May 5, 2006, *available at* 2006 WLNR 7711531 ("Judge Brinkema was clearly angered that when the jury spared Mr. Moussaoui's life on Wednesday, he exulted, 'America, you lost,' and said he had won.").

[9] Elizabeth Neuffer, *Four Get Life for Embassy Attacks*, Boston Globe, Oct. 19, 2001, *available at* 2001 WLNR 2230485 ("In a session fraught with emotion — and carried out under heightened security — Judge Leonard Sands levied the same stiff sentences on all men although two had been eligible for shorter terms. . . . [T]he shadow of the [September 11, 2001] terrorist attack on New York and Washington . . . hung over the court session, both literally and figuratively. The courthouse was wreathed in the acrid stench still emanating from ground zero. Gun-toting US marshals with bomb-sniffing dogs, signs of New York's increased security awareness, stood watch on the courthouse steps.").

[10] *See* Benjamin Weiser, *Mastermind Gets Life for Bombing of Trade Center*, N.Y. Times, Jan. 9, 1998, *available at* 1998 WLNR 2795240 ("Mr. Yousef wore a dark gray suit and a new growth of beard. He strode to the lectern when offered a chance to speak by the judge, and began to attack the United States and Israel, the peace process in the Middle East and the 'Jewish lobby,' which he said paid bribes to American officials to win their influence.").

[11] *See* Meyer Berger, *Capone Convicted of Dodging Taxes; May Get 17 Years*, N.Y. Times, Oct. 17, 1931, *available at* http://www.nytimes.com/learning/general/onthisday/big/1017.html (describing Capone's demeanor after the jury went to deliberate: "Capone, looking like a head barber off to meet his best girl, stood in the corridor after the jury went out. He was smiling, but the smile seemed the equivalent of the quavery music of the whistler passing the graveyard," as well as Capone's demeanor upon hearing the jury verdict: "He kept grinning at all and sundry in the court room, his bulky figure in a screaming green suit (one of the $135 ones) drawing all eyes toward him.").

held in the Eastern District of New York for John Gotti;[12] and the open trial and sentencing of Timothy McVeigh for his role in the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City.[13]

Second, public access plays a "significant positive role," *Press-Enterprise II*, 478 U.S. at 8-9, in a sentencing hearing. In particular, the Supreme Court has recognized several interrelated ways in which openness is beneficial in a criminal trial. *See Richmond Newspapers, Inc.*, 448 U.S. at 593-97. The recognized benefits of having open trials also apply in the context of sentencing proceedings.

To begin with, "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power . . . ." *Richmond Newspapers, Inc.*, 448 U.S. at 596 (quoting *In re Oliver*, 333 U.S. 257, 270 (1948)) (quotation marks omitted); *see also Globe Newspaper Co.*, 457 U.S. at 606 ("[I]n the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an

---

[12] *See* Arnold H. Lubasch, *Gotti Sentenced to Life in Prison Without the Possibility of Parole*, N.Y. Times, June 24, 1992, *available at* 1992 WLNR 3331979 ("Judge I. Leo Glasser sentenced the convicted boss of the Gambino crime family in a courtroom so packed that James M. Fox, the head of the New York office of the F.B.I., was wedged next to Joseph DeCicco, a reputed Gambino associate.").

[13] *See* Michael Fleeman, *McVeigh Team Rips Witness, Rests Case*, New Orleans Times Picayune, May 29, 1997, *available at* 1997 WLNR 1109708 ("After the last piece of defense evidence was introduced, McVeigh whispered to [one of his attorneys], then sat cross-legged at the defense table, his hands tightly clasped in front of his chin."); Peter G. Chronis and Howard Pankratz, *Tearful Parents Beg for Son's Life as Timothy McVeigh's Fate Goes to Jury Today*, The Denver Post, June 12, 1997, *available at* 1997 WLNR 542338 (describing "tearful pleas from [McVeigh's] parents to spare him" from the death penalty, and adding that "[a]s [his mother] choked back tears, McVeigh looked flushed, clasping his hands tightly together against the lower part of his face.").

essential component in our structure of self-government."). The need for such a restraint is also present in the sentencing context. "The presence of the public operates to check any temptation that might be felt by either the prosecutor or the court . . . to seek or impose an arbitrary or disproportionate sentence." *In re Washington Post Co.*, 807 F.2d at 389. Indeed, the fact that there is no jury at the sentencing proceeding, in contrast to jury trials, heightens the need for public access. *Cf. Press-Enterprise II*, 478 U.S. at 12-13 ("[T]he absence of a jury, long recognized as 'an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge,' . . . makes the importance of public access to a preliminary hearing even more significant." (quoting *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968)).).

Relatedly, openness in a trial builds public confidence in the criminal justice system because members of the public can observe whether justice is being carried out in adjudicating guilt or innocence. *Richmond Newspapers, Inc.*, 448 U.S. at 595 ("Open trials assure the public that procedural rights are respected, and that justice is afforded equally. Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law."). Likewise, openness in the sentencing context allows the public to observe whether the defendant is being justly sentenced, especially where the court, rather than a jury, is determining the sentence. *Eppinger*, 49 F.3d at 1253 ("The public must have the opportunity to observe and criticize the judiciary in the operation of its duties. In sentencing, unlike other aspects of criminal proceedings, it is the distinct province of the court to determine what constitutes [a] proper sentence." (quoting *United States v. Carpentier*, 526 F. Supp. 292, 295 (E.D.N.Y. 1981))); *In re Washington Post Co.*, 807 F.2d at 389.

Similarly, openness of a proceeding also promotes more accurate fact-finding, either because witnesses are more hesitant to commit perjury in a proceeding open to the public, or because "key witnesses unknown to the parties" may learn about a trial if it is public. *Richmond Newspapers, Inc.*, 448 U.S. at 596-97. As there may well be witnesses and contested issues of fact in a sentencing proceeding, *see Alcantara*, 396 F.3d at 198 (explaining that in both trials and sentencing proceedings, "[t]he defendant . . . can present evidence, call witnesses, and cross-examine government witnesses"), this rationale applies in a sentencing proceeding as much as it applies in a trial.

Relatedly, the Supreme Court has explained that "[u]nderlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs,'" *Globe Newspaper Co.*, 457 U.S. at 604 (quoting *Mills v. Alabama*, 84 U.S. 214, 218 (1966)), and "to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one," *id.* at 605. This rationale also applies in the sentencing context. For example, allowing the public "to see the application of sentencing laws in person is important to an informed public debate over these laws." *Alcantara*, 396 F.3d at 199 (citing Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 85 (1998)).

Finally, there is a "community therapeutic value" to having an open proceeding, because of the concerns and emotions of members of the public who have been affected by a crime or crimes. *Richmond Newspapers, Inc.*, 448 U.S. at 570. "When a shocking crime occurs, a community reaction of outrage and public protest often follows. Thereafter the open processes of justice serve an important prophylactic purpose, providing an outlet for

community concern, hostility, and emotion." *Id.* at 571 (citation omitted); *see, e.g.,* Mark Eddy et al., *Guilty on Every Count,* Denver Post, June 3, 1997, *available at* http://extras.denverpost.com/ bomb/bombv1.htm (describing the reaction of survivors of the 1995 Oklahoma City bombing upon hearing that the jury had found Timothy McVeigh guilty on all counts: "survivors rushed into the hall outside the courtroom where they cried, hugged and tried to console each other as this chapter in the bombing tragedy drew to a close"). This rationale applies as strongly in a sentencing proceeding as it does in a trial. *Alcantara,* 396 F.3d at 198; *see, e.g.,* Benjamin Weiser, *Mastermind Gets Life for Bombing of Trade Center,* N.Y. Times, Jan. 9, 1998, *available at* 1998 WLNR 2795240 ("Several victims of the [1993 World Trade Center] blast attended the [sentencing proceeding of Ramzi Yousef]. One, Charles Maikish, a former [World] Trade Center official, nearly broke down as he addressed the court on behalf of the families, reading a list of the names of each victim who had died in the bombing. Patricia Smith, whose pregnant daughter-in-law, Monica Smith, was killed in the explosion, did not speak in court but glared at Mr. Yousef's back as he stood just a few feet in front of her, addressing the judge. Later, Ms. Smith said she wanted to hit him with her cane.").

In sum, we conclude, as have the other courts of appeals that have addressed this issue, that the press and public have a First Amendment right of access to sentencing proceedings.[14]

---

[14] We do not, however, call into question "the practice of keeping presentence reports confidential," *CBS, Inc.,* 765 F.2d at 826, which is a distinct issue for multiple reasons. First, in contrast to sentencing proceedings, "[presentence] reports themselves have historically been treated as confidential . . . ." *United States v. Huckaby,* 43 F.3d 135, 138 (5th Cir. 1995). Moreover, unlike with sentencing proceedings, "[t]he Federal Rules of Criminal Procedure expressly provide for limited [public] access to information contained in presentence reports." *CBS, Inc.,* 765 F.2d at 826.

## C.  Notice and an opportunity to be heard

Because there is a First Amendment right of access to sentencing proceedings, there is a presumption that they should remain open, absent specific, substantive findings made by the district court that closure is necessary to protect higher values and is narrowly tailored to serve such goals:

> [T]he presumption [of openness] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enterprise II*, 478 U.S. at 9-10 (quoting *Press-Enterprise I*, 464 U.S. at 510) (quotation marks omitted).  In making its findings, the court must consider any "reasonable alternatives to closure." *Press-Enterprise II*, 478 U.S. at 14 (citing *Press-Enterprise I*, 464 U.S. at 510; *Richmond Newspapers, Inc.*, 448 U.S. at 581); *see also Edwards*, 823 F.2d at 119 ("*Press* [*Enterprise*] *II* requires, if closure of a presumptively open proceeding is to withstand a [F]irst [A]mendment challenge, that the court make specific, on-the-record, factfindings demonstrating that a substantial probability exists that an interest of a higher value will be prejudiced and that no reasonable alternatives to closure will adequately protect that interest.").  If the court decides to close a proceeding, it must then make the "transcript of the closed proceedings available within a reasonable time . . . ." *Press-Enterprise I*, 464 U.S. at 512.

In this case, we do not reach the question of whether the district court's decision to close Cardenas-Guillen's sentencing proceeding was substantively correct.  The Chronicle does not challenge this.  Rather, the Chronicle is challenging the district court's refusal to follow two procedural

requirements before closing the sentencing of Cardenas-Guillen: (1) to give public notice of contemplated closure of the proceeding, and (2) to give interested parties, such as the Chronicle, an opportunity to be heard before the sentencing proceeding was closed.

Those procedural requirements stem from the Supreme Court's dictate that trial courts should make determinations about closure "on a case-by-case basis." *Globe Newspaper Co.*, 457 U.S. at 609. The Court explained that "[o]f course, for a case-by-case approach to be meaningful, representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.'" *Id.* at 609 n.25 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 401 (1979) (Powell, J., concurring)); *see also Edwards*, 823 F.2d at 119 ("In requiring a case-by-case resolution of the issues concerning closure of presumptively open proceedings, the *Globe* Court noted that, for this approach to be effective, 'the press and general public must be given an opportunity to be heard on the question of their exclusion.'" (quoting *Globe Newspaper Co.*, 457 U.S. at 609 n.25)).

The courts of appeals that have addressed the question of whether notice and an opportunity to be heard must be given before closure of a proceeding or sealing of documents to which there is a First Amendment right of access, have uniformly required adherence to such procedural safeguards. *See, e.g., Alcantara*, 396 F.3d at 200 ("[A] motion for courtroom closure should be docketed in the public docket files . . . . Entries on the docket should be made promptly, normally on the day the pertinent event occurs . . . . We think this type of general public notice suffices to afford an adequate opportunity for challenge to courtroom closure." (quoting *In re Herald Co.*, 734 F.2d at 102-03)); *Phoenix Newspapers, Inc. v. U.S. Dist. Ct.*, 156 F.3d 940, 949 (9th Cir. 1998) ("[I]f a court contemplates sealing a document or transcript, it must provide sufficient notice to the public and

press to afford them the opportunity to object or offer alternatives. If objections are made, a hearing on the objections must be held as soon as possible."); *Oregonian Publ'g Co.*, 920 F.2d at 1466 (9th Cir. 1998) (affirming previous holding that "those excluded from the proceeding must be afforded a reasonable opportunity to state their objections" (citing *Brooklier*, 685 F.2d at 1167-68; *In re Washington Post Co.*, 807 F.2d at 390-91)); *United States v. Valenti*, 987 F.2d 708, 713 (11th Cir. 1993) (explaining that giving "notice and an opportunity to be heard on a proposed closure" is required prior to closing a "historically open process where public access plays a significant role"); *Robinson*, 935 F.2d at 289 (explaining that before a plea agreement is sealed, "(1) [t]he government must file a written motion to seal the plea agreement and notice of that motion must be entered in the public docket; [and] (2) [t]he trial court must promptly allow interested persons an opportunity to be heard before ruling on the motion and entering the sealing order"); *In re Washington Post Co.*, 807 F.2d at 390 (holding that before making specific findings in conjunction with an order to close a proceeding or seal documents, the district court must docket closure motions "'reasonably in advance of their disposition'" in order to give the press and public notice and then "provide interested persons 'an opportunity to object to the request before the court ma[kes] its decision'" (quoting *In re Knight Publ'g Co.*, 743 F.2d at 234-35)); *Criden*, 675 F.2d at 559-60 (holding that in order to provide notice, "[t]he district courts should take whatever steps are necessary to ensure that the docket entries are made a reasonable time before the closure motion is acted upon" and explaining that doing so would allow "the public and press . . . to take timely action if they wished"). Furthermore, the Department of Justice has issued "guidelines [that] generally prohibit a government attorney from consenting to[, inter alia,] a closed plea or

sentencing proceeding when the public has not been given notice of the proposed closure." *Alcantara*, 396 F.3d at 200 n.9 (citing 28 C.F.R. § 50.9).

These procedural requirements are essential to safeguarding the First Amendment right of access to sentencing proceedings. Given the weight of the right of access, we agree that courts must provide the press and public with notice and an opportunity to be heard before closing a sentencing proceeding,[15] because "it seems entirely inadequate to leave the vindication of a First Amendment right to the fortuitous presence in the courtroom of a public spirited citizen willing to complain about closure . . . ." *Alcantara*, 396 F.3d at 199-200 (quoting *In re Herald Co.*, 734 F.2d at 102); *see also Criden*, 675 F.2d at 559 ("The press should not be expected to 'camp out' in the hallway in order to ascertain whether evidentiary proceedings are being conducted in chambers."). These requirements are "not mere punctilios, to be observed when convenient." *Phoenix Newspapers*, 156 F.3d at 951. The trial court cannot properly weigh the First Amendment right of access against the interests served by closure, nor can it fully consider alternatives to closure, without providing notice and an opportunity to be heard to the press and public:

> All too often, parties to the litigation are either indifferent or antipathetic to disclosure requests. This is to be expected: it is not their charge to represent the rights of others. However, balancing interests cannot be performed in a vacuum. Thus, providing the public notice and an opportunity to be heard ensures that the trial court will have a true opportunity to weigh the legitimate concerns of all those affected by a closure decision.

---

[15] We do not speculate on the possibility of whether, in a future case, some circumstance might arise that could justify a trial court's deciding to give no notice or opportunity to be heard, of any kind, before closing a sentencing proceeding. As we explain below, the circumstances of this case were not sufficient to justify such a decision. Any decision to deny all notice and opportunity to be heard would have to be justified under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which we refer to later in this opinion.

*Id.*

The importance of these requirements, however, does not preclude a trial court from choosing among various options, given the circumstances and interests involved in a particular case, to determine how it will provide notice and an opportunity to be heard. For example, in giving the press and public notice that a proceeding may be closed, the trial court may choose to docket the motion. *See, e.g., Alcantara*, 396 F.3d at 200; *Robinson*, 935 F.2d at 288. The trial court may do that, or it may decide that security or other concerns warrant declining to reveal what kind of proceeding is going to be closed and simply place a notice on the docket that there is a motion to close a proceeding, leaving the parties to submit arguments regarding the various proceedings that could hypothetically be closed. Relatedly, the trial court may decide to disclose all, some, or none of what is contained in the motion to close. *Cf. Robinson*, 935 F.2d at 290 ("We fail to see anything in this case that would have precluded the government from filing a written motion to seal (notice of which would be entered on the public docket), with the plea agreement attached, and then asking the court to seal both the motion and the plea agreement pending final disposition. This would have protected the secrecy of the plea agreement until the court ruled on the motion after hearing from interested parties."); *In re Washington Post Co.*, 807 F.2d at 391 ("A district court considering a motion for closure of hearings for national security reasons need not divulge the facts of the situation to persons seeking access to the hearings.").

Similarly, in giving interested members of the press and public an opportunity to be heard, the trial court can choose among various options to determine how to do so in a particular case. At the very least, the trial court can permit interested parties to submit briefs on whether a proceeding should be closed. In addition, the trial court may decide to hold a hearing at

which parties can orally argue before the court. Finally, the trial court "may file its statement of the reasons for its decision under seal" if it deems that doing so is necessary. *In re Washington Post Co.*, 807 F.2d at 391. This court can, of course, still review a sealed statement of reasons.

Of course, the fact that a trial court may choose among various options does not mean that it should automatically choose the most minimal options available. "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Trial courts should weigh these factors in relation to the unique facts of the case where closure is at issue. *Cf. United States v. Abuhamra*, 389 F.3d 309, 318-28 (2d Cir. 2004) (applying the *Mathews v. Eldridge* test by weighing the defendant's interest in having notice and an opportunity to be heard, as well as the public and the defendant's shared interest in open criminal proceedings, against the government's interest in protecting the identity and safety of confidential witnesses, and concluding that "*ex parte* submissions in opposition to bail release . . . should generally not be received or considered by district courts"). In this appeal, we need not examine the factors in detail, because the district court gave the press and public no notice, and no opportunity to be heard, whatsoever. Regardless of exactly what arrangements would have been sufficient, the district court's actions did not provide even a minimal level of due process before closing the sentencing proceeding.

The government does not dispute that notice and an opportunity to be heard should generally be afforded to the press and public before the closure of a proceeding to which a First Amendment right of access attaches. Instead, the government advances two alternative arguments: (1) that the security concerns of this case were such that the district court was excused from giving notice and an opportunity to be heard; and (2) in the alternative, that the district court essentially gave the Chronicle an opportunity to be heard because it took into account the Chronicle's February 9, 2010 motion to intervene and the Chronicle's October 30, 2009 letter, which was attached to the motion to intervene, when it closed the sentencing proceeding. We address each argument in turn.

First, we conclude that the security concerns raised by the government in this case did not justify the district court's decision not to give the press and public any notice or opportunity to be heard prior to closure. At the sentencing proceeding, the district court gave two rationales for its decision to seal the government's motion to close the sentencing proceeding: "failure to seal the United States' motion to seal will result in a substantial probability that the lives and safety of persons will be placed in danger and that ongoing investigations will be jeopardized." The government contends that holding a preclosure hearing would have endangered Cardenas-Guillen, courthouse and United States Marshals Service personnel, and members of the public in the courthouse, because of the possibility of an attack on the courthouse due to Cardenas-Guillen's presence during such a hearing, as well as the possibility of attack while transporting Cardenas-Guillen to and from the courthouse. While this concern is understandable, it did not preclude giving notice and an opportunity to be heard. For instance, the district court could have simply given notice that the government had filed a sealed motion to close the upcoming sentencing proceeding, and given the

press and public an opportunity to be heard by inviting any interested parties to write and express their opposition. Anyone who wanted to see the government's sealed motion before filing an opposing motion could also have filed a motion to do so, which the district court could have granted or denied in the exercise of its sound discretion.

Neither did the district court's concern about jeopardizing ongoing investigations preclude it from giving notice and an opportunity to be heard in this case. The district court noted at sentencing that pursuant to the government's request, it would not docket the proceeding or make the transcript available until the United States Marshals Service informed the district court "that the . . . possibility of substantial danger or substantial possibility of danger imminent — the public being placed in imminent danger has passed . . . ." And, as the government noted in its brief, the docket shows (1) that the proceeding was docketed within hours of the end of the hearing; (2) that the hearing and transcript were made available to the public; and (3) that the Chronicle ordered a copy of the transcript, which was completed by the next day. The fact that the government requested for the sentencing to occur, and that it did not object to the docketing of the proceeding within hours of the hearing and the release of the transcript the next day, shows that at some point before the sentencing proceeding, the government had resolved any concerns it had regarding ongoing investigations. After the government resolved those concerns, instead of immediately holding the sentencing proceeding, the district court could instead have given notice and an opportunity to be heard on whether the sentencing should be closed. It would have been no more harmful with regard to ongoing investigations for the district court to take these steps — thereby providing notice and an opportunity to be heard — than to do what it actually did.

In sum, the government's contention that security concerns justified the lack of notice and an opportunity to be heard prior to closure of the sentencing proceedings is unpersuasive. The district court had multiple options available to it for providing notice and an opportunity to be heard prior to closure, while also accommodating the security concerns raised by the government.[16]

The government argues in the alternative that even if the district court was required to give notice and an opportunity to be heard before closing the sentencing proceeding, the district court essentially gave the Chronicle such an opportunity to be heard. Specifically, the government contends that the district court was aware of, and stated that it had considered, the Chronicle's February 9, 2010 motion to intervene and the letter from the Chronicle dated October 30, 2009, which was attached to the motion to intervene. Thus, the government concludes, the district court was not required to "hold a hearing and write redundant findings of fact that merely reiterate truisms." Gov. Br. 25, 37 (quoting *Edwards*, 823 F.2d at 119 (quotation marks omitted)).

We are not persuaded by this argument. The February 9, 2010 motion filed by the Chronicle did not deal with closure of any proceedings. Instead, it contained a motion to intervene and arguments against continued sealing of documents. The Chronicle did not have notice of what was happening: it did not know that there would be an upcoming sentencing hearing or any other proceeding. The arguments in its February 9, 2010 motion dealt with what the Chronicle knew was happening — the continued sealing of

---

[16] We note that in its brief, the government cited to but did not explicitly discuss another security concern, which was outlined in the government's sealed filings to the district court. We conclude that there are options among those we have discussed here that would have adequately addressed that concern while also providing the public and press with notice and an opportunity to be heard. Thus, that security concern does not justify the failure to provide notice and an opportunity to be heard.

documents, not the closure of a sentencing hearing. Even the October 30, 2009 letter only makes a general argument that notice should be given if closure of a proceeding was contemplated at some point in the future. The Chronicle had no notice and was not given the opportunity to make arguments addressing precedents regarding access to and closure of sentencing proceedings; to argue that openness is important in proceedings in this particular case, a case of great public importance; or to suggest more narrowly tailored alternatives to closure. Moreover, it would be perverse to hold that the district court fulfilled its obligation to provide notice and an opportunity to be heard in this case because the Chronicle's reporter "'camp[ed] out' in the hallway," *Criden*, 675 F.2d at 559, and its attorneys sent the court anticipatory requests asking for notice and an opportunity to be heard if a proceeding were to be closed. The court is not relieved from its duty to adhere to due process requirements, in order to safeguard the First Amendment right of access, by the fact that a newspaper, out of an abundance of caution, took some steps to attempt to secure that right.

We conclude that the district court did not give the Chronicle notice and an opportunity to be heard before closing the sentencing proceeding. Thus, the district court deprived the Chronicle of its First Amendment right without following the proper procedures — i.e., without due process.

## CONCLUSION

We conclude (1) that this court has jurisdiction over the case, because it falls within the exception to mootness for issues that are capable of repetition, yet evading review; (2) that the press and the public have a First Amendment right of access to a sentencing proceeding; and (3) that the district court deprived the Chronicle of its First Amendment right of access without due process in refusing to give the press and public, including the Chronicle, notice and an opportunity to be heard before closing the

sentencing proceeding. Because the sentencing of Cardenas-Guillen has already occurred, we simply REVERSE the district court's orders of February 24, 2010 (as amended by the March 2, 2010 order) and of February 26, 2010, denying the Chronicle's requests for notice and an opportunity to be heard prior to closure, as well as the district court's February 24, 2010 order (as amended by the March 2, 2010 order) denying the Chronicle's motion to open the sentencing proceeding. *See Press-Enterprise II*, 478 U.S. at 15 (reversing because the lower court "failed to consider the First Amendment right of access to criminal proceedings"); *Richmond Newspapers, Inc.*, 448 U.S. at 580-81 (reversing where "trial judge made no findings to support closure; no inquiry was made as to whether alternative solutions would have met the need to ensure fairness; there was no recognition of any right under the Constitution for the public or press to attend the trial"). We do not decide whether the district court's decision to close the sentencing proceeding was substantively wrong, but we reverse the order denying the motion to open the sentencing proceeding because the district court did not follow the required procedures before rendering its decision to close. *See In re Washington Post Co.*, 807 F.2d at 393.

It is so ordered.